UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE HUNTINGTON NATIONAL BANK,

> Plaintiff,

- against -

BRISTOW U.S. LLC, a Louisiana Limited Liability
Company, and BRISTOW GROUP INC., a Delaware
Corporation,

> Defendants.

**OPINION AND ORDER**

17 Civ. 8595 (ER)

Ramos, D.J.:

On November 6, 2017, The Huntington National Bank ("HNB" or "Plaintiff") filed the instant action against Bristow U.S. LLC ("Bristow") and Bristow Group Inc. (collectively, "Defendants").  The parties' dispute arises out of Defendants' alleged failure to return a leased helicopter to HNB with its engines enrolled in a certain engine maintenance program.  Doc. 1. As damages, HNB seeks holdover rent, the estimated cost of the engines' enrollment in an acceptable engine maintenance program, and attorneys' fees.

Before the Court is HNB's motion for summary judgment on its claims against Defendants and on Defendants' counterclaims.  Doc. 28.  Resolution of the motion turns on the answer to the following question:  Were Defendants obligated to enroll the helicopter's engines in an engine maintenance program (or to pay the estimated costs for such enrollment) *before* Defendants received from HNB a time and location to return the helicopter?  For the reasons explained below, the Court finds that the Lease's provisions are reasonably susceptible to different interpretations that result in different conclusions, rendering the Lease ambiguous. Accordingly, HNB's motion is GRANTED in part and DENIED in part.

## I.  BACKGROUND

### 1.  <u>Factual Background</u>[1]

Bristow is a Louisiana limited liability company that provides industrial aviation services worldwide.  The sole member of Bristow is Bristow Group, a Delaware corporation with its principal place of business in Texas.

On December 29, 2011, Bristow, as Lessee, and Wilmington Trust Company, as Lessor, executed an agreement (the "Lease") whereby Wilmington Trust, in its capacity as "owner trustee," leased to Bristow a Sikorsky S-92 helicopter (the "Aircraft").  Doc. 1-1.  Bristow negotiated the Lease's terms and conditions with Banc of America Leasing & Capital, LLC, which was the beneficial interest holder of the Aircraft.  Doc 41 ¶ 47.  Bristow Group guaranteed Bristow's obligations under the Lease.  Doc. 34 ¶ 8.  Following the Lease's execution, Banc of America assigned to HNB—an Ohio-based bank—all its rights and interest in the Lease and Aircraft.  *Id.* ¶¶ 8–9.

Pursuant to the Lease, the Rent Commencement Date was January 5, 2012, and the Expiration Date was January 5, 2017.  Doc. 41 ¶ 50.  The Lease incorporates several supplements, exhibits, riders, and addenda attached thereto.  *Id.* ¶ 51.  This includes the Return Addendum, which sets forth the parties' obligations with respect to the Aircraft's return upon expiration, cancellation, or other termination of the Lease.  *Id.*  Three paragraphs in the Return Addendum are of particular relevance to this motion:

---

[1] The following facts are recounted in the light most favorable to Defendants, the nonmovants.  *See Edelhertz v. City of Middletown*, 943 F. Supp. 2d 388, 393 (S.D.N.Y. 2012), *aff'd*, 714 F.3d 749 (2d Cir. 2013) (per curiam).  The facts are drawn from Defendants' Response and Counter-Statement to Plaintiff's Local Civil Rule 56.1 Statement of Facts, *see* Doc. 34; Plaintiff's Response to Defendants' Counter-Statement of Material Facts, *see* Doc. 41; and the parties' supporting declarations and exhibits.  References to the parties' Rule 56.1 Statements incorporate the evidentiary citations therein, and, in describing the Lease's provisions, all capitalized terms not expressly defined in this Opinion shall have the meaning ascribed to them in the Lease.  Where the meaning of a capitalized word or phrase is not obvious or departs from its commonly understood meaning, the Court will recite its specific meaning under the Lease.

2

*First*, under paragraph (a), Bristow agreed to return the Aircraft "at a location specified by [HNB] within the continental U.S." and in accordance with all other requirements in the subsequent paragraphs:

> (a)  Condition Upon Return.  Unless purchased by Lessee, upon the expiration, cancellation, or other termination of the Lease, *Lessee will return the Aircraft (together with all Records) to Lessor at a location specified by Lessor within the continental U.S.* . . . The Aircraft, at Lessee's expense, *upon redelivery pursuant hereto* . . .  (vi) shall . . . be in compliance with all other Applicable Law and Maintenance Requirements; and (vii) shall be otherwise in the condition and repair required under the Lease.

Doc. 1-1–1-2, Return Addendum ¶ (a) (emphases added).

*Second*, paragraph (f), titled "Maintenance Contracts," contains two subparts.  Subpart (i) simply provides that the requirements set forth in paragraphs (c)–(e) are inapplicable if, "at the time of the return of the Aircraft to Lessor," certain maintenance requirements concerning the Aircraft's Rotor Blade, Rotor Component, APU (auxiliary power unit), and Airframe are met.

Subpart (ii)—the specific provision at issue here—concerns the maintenance requirements for the Aircraft's Engines.  In short, subpart (ii) provides that Bristow must do one of three things to comply with the Return Addendum.  It must either:  (1) *assign* its rights under its current "Engine Maintenance Program" [2] with General Electric Company ("GE") to HNB; (2) "*arrange*," at no cost to HNB, for the Engine's "eligibility" in a comparable Engine Maintenance Program between HNB and GE; or (3) *pay* HNB an amount equal to the current estimated cost of causing the Engines' full enrollment in an Engine Management Program.  In full, subpart (ii) provides:

---

[2] "Engine Maintenance Program shall mean that certain Maintenance Cost Per Hour ("MCPH") Engine Services Agreement dated as of October 25, 2007 between General Electric Company ("GE") and [Bristow Group] . . . or such other similar engine maintenance program from GE or another similar program provider (which such other program shall not be on a pro rata basis, and such other program and the provider thereof must be acceptable to Lessor in its reasonable discretion); and *upon return*, consistent with the requirements of paragraph (f)(ii) of the Return Addendum."  Doc. 1-1 at 27 (emphasis added).

3

(ii) Engines.  The Engines *shall then* be enrolled in the Engine Management Program; and with respect to both Engines, Lessee shall either (A) *assign* all of its rights and interests under the Engine Management Program, without cost or other condition to such assignment (as acknowledged in writing by an authorized representative of the maintenance provider and any other party to the agreements relating to such program), (B) at no cost or expense to Lessor, *arrange* to have the Engines eligible with no initial "buy-in" or "start-up" costs to Lessor to be completely covered (and not on a pro rata basis) under a service and maintenance contract between Lessor (or its designee) and the manufacturer (or other entity acceptable to Lessor in its sole discretion), which such service and maintenance contract provides for the complete maintenance and overhaul of the Engines for a fixed hourly rate (which such rate shall be at the then fair market rate for similar engines) and shall otherwise be in form and substance acceptable lo Lessor, or (C) *pay* to Lessor an amount equal to the current estimated cost of causing the Engines to be fully enrolled in an Engine Management Program.  *The payment required by sub-clause (C) shall be made by Lessee to Lessor in good funds on the Required Return Date*, as liquidated damages, and not as a penalty, for Lessee's failure to comply with sub-clauses (A) and (B).

*Id.* ¶ (f)(ii) (emphases added).  Notably, aside from the phrase "shall then," and unlike subpart (i), subpart (ii) does not contain a fixed time for Bristow's performance with respect to its option either to assign its rights in its Engine Maintenance Program with GE or to arrange for the Engines' eligibility in a comparable one acceptable to HNB.  Subpart (ii) does, however, provide that if Bristow elected instead to pay the estimated cost of causing the Engines' full enrollment in an Engine Maintenance Program—in lieu of an assignment or arrangement—such payment would be due at the Aircraft's "Required Return Date."  Doc. 41 ¶ 59.

*Third*, and finally, paragraph (m) of the Return Addendum provides that HNB is entitled to holdover rent in the event Bristow failed to return the Aircraft "at the time, place and in the condition specified" in the Return Addendum:

(m) <u>Holdover Rent</u>.  *If Lessee fails to return the Aircraft (including the Records) at the time, place and in the condition specified in this Return Addendum, (A) all of Lessee's obligations under the Lease shall continue until it is so returned* . . . and . . . Lessee shall pay to Lessor an amount equal to the greater of the fair market rent value . . . or the Daily Rent for each day after the end of the Term to, but excluding the day the Aircraft is actually returned in accordance with this Return Addendum. . . .

As early as June 2016, approximately seven months prior to the Lease's Expiration Date, Bristow and HNB engaged in discussions concerning whether Bristow would re-lease or purchase the Aircraft from HNB.  Doc. 41 ¶ 67.  In August 2016, Bristow determined that it would not re-lease or purchase the Aircraft and subsequently notified HNB that it planned to return the Aircraft upon the Lease's expiration.  *Id.* ¶ 68.  Thus, on August 28, 2016, Bristow provided HNB with contact information for its personnel who would coordinate the return of the Aircraft to HNB, *id.* ¶ 69, and it continued to follow up with HNB regarding the Aircraft's return for several weeks thereafter, *id.* ¶ 73.

On October 23, 2016, approximately two months prior to the Lease's Expiration Date, Bristow—concerned that HNB was not taking steps to allow for the Aircraft's return by the Expiration Date—emailed HNB to schedule a return inspection of the Aircraft.  *Id.* ¶ 74.  Despite Bristow's inquires, HNB did not participate in discussions with Bristow concerning the Aircraft's return until November 2016.  *Id.* ¶ 75.  At that time, HNB informed Bristow that it intended to open an account with GE to facilitate transfer of the Aircraft's Engines from Bristow's Engine Maintenance Program to HNB.  *Id.* ¶ 78.

On December 20, 2016, approximately two weeks before the Lease's Expiration Date, Defendants emailed HNB requesting an update as to whether agreements had been reached with Sikorsky (the Aircraft's manufacturer) and GE concerning enrollment of the Aircraft's Engines into an Engine Maintenance Program.  *Id.* ¶ 80.  Defendants wrote that "[i]t is very important that these agreements are put in place among [HNB] and the . . . providers so that the benefits can be transferred to the bank at lease expiration."  *Id.*  In that same email, Defendants also asked HNB to tell them "with whom and at what location [the Aircraft] is going to be stored after lease expiration."  Doc. 33-1 Ex. D.

The next day, HNB advised Defendants that it had called GE to discuss transferring the Engines from Defendants' Engine Maintenance Program.  Doc. 41 ¶ 81.

The Lease expired on January 5, 2017.  At no time prior to the Expiration Date did HNB specify a date and location for the Aircraft's return notwithstanding that Bristow was ready, willing, and able to return the Aircraft to HNB on the Expiration Date.  *Id.* ¶¶ 86–87.

On several occasions following the Expiration Date, Defendants continued to request return instructions or, alternatively, confirmation that HNB wanted them to store the Aircraft for thirty days in accordance with paragraph (j) of the Return Addendum.[3]  *Id.* ¶¶ 94–98.  HNB failed to respond until January 26, 2017.  That day, HNB emailed Defendants stating that there were "a number of issues that needed to be addressed" prior to the formal termination of the Lease.  Doc. 33-1 Ex. I; *see also* Doc. 41 ¶ 99.  According to HNB, one issue concerned "[d]elivery of the [Aircraft] . . . to [HNB]'s chosen point of return in accordance with the Return Addendum to the Lease."  Doc. 41 ¶ 99.  HNB informed Defendants that it was "finalizing plans to have the [A]ircraft stored at RSG [Aviation, Inc.] at Meacham International Airport in Fort Worth, Texas."  *Id.*

On February 3, 2017, HNB emailed Defendants and wrote that it "want[ed] to complete the delivery of [the Aircraft] to RSG at Meacham International Airport in Fort Worth, Texas[,] as soon as possible."  Doc. 33-1 Ex. K; Doc. 41 ¶ 101.  However, HNB did not provide delivery instructions.  Doc. 41 ¶ 101.

---

[3] Paragraph (j) of the Return Addendum reads, in part, as follows:

> (j) <u>Storage</u>.  Upon the expiration . . . of the Lease, Lessee will, if requested by Lessor, permit Lessor to store the Aircraft at the Primary Hangar Location for up to thirty (30) days.  During such storage period Lessee will, at its own expense, keep the Aircraft properly hangered and will permit Lessor or any Person designated by Lessor, including the authorized representatives of any prospective purchaser, lessee or user of the Aircraft to inspect the same.

One month following the Lease's Expiration Date, on February 16, 2017, HNB emailed Defendants to inform them that it had contacted GE to discuss the Engines' enrollment in a new GE maintenance and service contract. *Id.* ¶ 103.  HNB explained that it had engaged in several phone conversations with GE, and HNB attached to its email a draft letter agreement from GE that "outline[d] what [GE w]as willing to offer to HNB on a going forward basis."  Doc. 33 Ex. M.  At this time, HNB also noted that it believed the draft agreement was "not responsive to the requirements of HNB or the return conditions of the Lease"—specifically, paragraph (f)(ii) of the Return Addendum. *Id.*

On March 9, 2017, more than two months following the Lease's Expiration Date, HNB advised Defendants that it was designating the RSG facility at Meacham International Airport in Fort Worth, Texas, as the location for redelivery of the Aircraft.  Doc. 41 ¶ 105.  HNB represented that it was prepared to send a pilot to Bristow's facility in Angleton, Texas, on March 13, 2017, to conduct an end-of-lease evaluation flight, where, at the end of the evaluation, the helicopter would be flown to Forth Worth. *Id.*  In connection with the contemplated return of the Aircraft to HNB, Defendants forwarded to HNB, among other documents, a letter agreement that would extend coverage for the Aircraft under Defendants' Engine Maintenance Program with GE for an additional 60 days—time Defendants believed was enough to allow HNB to complete its own program arrangements with GE. *Id.* ¶ 106.

On March 13, 2017, Bristow had pilots available in Angleton to conduct the test flight; however, HNB did not send a pilot to Angleton. *Id.* ¶¶ 107–109.  Following this date, HNB neither specified another date and location for the Aircraft's return nor specified a "Required Return Date" pursuant to paragraph (f)(ii) of the Return Addendum. *Id.* ¶ 110.  Instead, HNB proposed a new potential arrangement whereby Bristow would continue to maintain the Aircraft

pursuant to Bristow's Engine Maintenance Program with GE, at Bristow's cost, while HNB

attempted to remarket the Aircraft. *Id.* ¶ 111.  Defendants told HNB that this arrangement was

unacceptable. *Id.* ¶ 112.

On June 13, 2017, five months following the Lease's Expiration Date, HNB again

informed Bristow that it believed the Aircraft did not comply with paragraph (f)(ii) of the Return

Addendum. *See* Doc. 41 ¶ 121; *see also* Doc. 33-2 Ex. W.  Specifically, HNB claimed

Defendants had failed their obligation to assign their rights in, to arrange for the Engines to be

eligible in, or to pay the estimated costs for enrollment in an Engine Maintenance Program.

Defendants disagreed at that time and continue to do so now.  Instead, Defendants believe

that HNB's continuous refusal to provide a time and place for the Aircraft's return was made in

bad faith. *See* Doc. 35 at 2 ("To avoid incurring the costs associated with owning an Aircraft

without an operating lease, HNB sat on its hands as long as possible and let Bristow store,

maintain, and insure the Aircraft for HNB's benefit.").  In support of their hypothesis,

Defendants point out that there was an oversupply of Sikorsky S-92 helicopters—the Aircraft's

make and model—and an oversupply of other heavy passenger transportation helicopters in the

market prior to the Lease's Expiration Date, *see* Doc. 41 ¶ 90, and note that HNB has yet to find

another operator to lease or sell the Aircraft to.  *Id.* ¶¶ 91, 130.

After several letters back and forth among the parties, *see id.* ¶¶ 122–24, on July 29,

2017, Defendants notified HNB that it intended to "leave the Aircraft at the Fort Worth

Meacham International Airport, the only return location ever identified by HNB . . . on Friday,

August 4, 2017," *id.* ¶ 124.

On August 4, 2017, Defendants delivered the Aircraft for storage at RSG Aviation Inc., in Fort Worth, Texas.  Doc. 34 ¶ 29.  HNB has had possession of the Aircraft since August 2017. Doc. 41 ¶ 127.

**2.  Procedural Background**

HNB filed the instant action on November 6, 2017.  Doc. 1.  In its Complaint, HNB asserts a claim for breach of contract against Defendants for their alleged refusal to return the Aircraft to HNB in accordance with paragraph (f)(ii) of the Return Addendum.  In addition to monetary damages, HNB seeks a declaration that Defendants remain liable to it for (1) holdover rent pursuant to paragraph (m) of the Return Addendum, and for (2) the estimated cost of the Engines' full enrollment in a new Engine Maintenance Program pursuant to paragraph (f)(ii)(C).

Defendants answered HNB's Complaint on December 29, 2017.  In addition to denying liability, Defendants assert counterclaims against HNB for (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) unjust enrichment, and (4) declaratory judgment.  Doc. 16.  Defendants maintain that they've complied with the Return Addendum and that they were always ready, willing, and able to redeliver the Aircraft to HNB upon the Lease's expiration.  According to Defendants, HNB's refusal to receive the Aircraft back caused them to incur substantial damages in the form of storage, maintenance, and insurance costs.

Following a pre-motion conference with the Court, HNB moved for summary judgment on all its claims and all Defendants' counterclaims.  Docs. 28–31.  This Court has jurisdiction over this action, as the parties are completely diverse and the amount in controversy exceeds $75,000, exclusive costs and interest.  Doc. 41 ¶¶ 1–4; *see also* 28 U.S.C. 1332(a).  Moreover, pursuant to the Lease and accompanying Guaranty, the parties have consented to personal jurisdiction and venue in this District.  Doc. 41 ¶¶ 5–6.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the outcome of the litigation under the governing law.  *Id.*  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.  In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing, e.g., *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

In deciding a motion for summary judgment, the Court construes the facts in the light most favorable to the nonmovant and resolves all ambiguities and draws all reasonable inferences against the movant. *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011).  The nonmovant, however, may not rely on unsupported assertions or conjecture in opposing summary judgment. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  Rather, the nonmovant "must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986)).

## III. DISCUSSION

### 1. <u>Whether HNB is Entitled to Summary Judgment for Breach of Contract</u>

The Court first turns to HNB's claim for breach of contract.  To succeed on such a claim under New York law, a plaintiff must establish (1) the existence of a valid contract among the parties, (2) performance by the plaintiff, (3) non-performance by the defendants, and (4) damages.  *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (citation omitted); *see also Flomenbaum v. N.Y. Univ.*, 890 N.Y.S.2d 493, 502 (App. Div. 1st Dep't 2009) (explaining same), *aff'd*, 929 N.E.2d 403 (N.Y. 2010).  "Summary judgment is only proper in contract disputes if the language of the contract is wholly unambiguous."  *Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 115 (2d Cir. 1994) (internal quotation marks omitted).  "Whether a contractual term is ambiguous must be determined by the court as a matter of law, looking solely to the plain language used by the parties within the four corners of the contract to discern its meaning and not to extrinsic sources."  *Ashwood Capital, Inc. v. OTG Mgmt., Inc.*, 948 N.Y.S.2d 292, 297 (App. Div. 1st Dep't 2012).

In interpreting a contract's terms, "[t]he entire contract must be reviewed and [p]articular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby."  *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 920 N.E.2d 359, 363 (N.Y. 2009) (internal quotation marks omitted); *accord In re Estate of Stravinsky*, 770 N.Y.S.2d 40, 45 (App. Div. 1st Dep't 2003) ("Contracts are not to be interpreted by giving a strict and rigid meaning to general words or expressions without regard to the surrounding circumstances or the apparent purpose which the parties sought to accomplish." (emphasis and internal quotation marks omitted)).

"A contract is ambiguous if the provisions in controversy are reasonably or fairly susceptible of different interpretations." *Almah LLC v. AIG Emp. Servs., Inc.*, 68 N.Y.S.3d 429, 430 (App. Div. 1st Dep't 2018) (citation omitted).  Contrariwise, a contract is unambiguous if the provision in controversy has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170–71 (N.Y. 2002).  Moreover, where a contract is clear and unambiguous on its face, discovery regarding the parties' intent is rendered unnecessary, as any parol evidence would be inadmissible.  *Ashwood Capital*, 948 N.Y.S.2d at 299; *accord RM Realty Holdings Corp. v. Moore*, 884 N.Y.S.2d 344, 347 (App. Div. 1st Dep't 2009) ("Any such discovery would simply be an opportunity for [a party] to uncover parol evidence to attempt to *create* an ambiguity in an otherwise clear and unambiguous agreement.").

Here, the parties agree that the Lease is a legally enforceable contract that binds them. *See* Doc. 29 at 4; Doc. 35 at 7.  Thus, the first element of HNB's claim for breach of contract is satisfied.  The Court next considers whether HNB fully performed under the Lease.

### A.    *There are Questions of Material Fact Concerning HNB's Performance*

HNB argues that it has fully performed all its obligations under the Lease, satisfying the second element for breach of contract.  Doc. 29 at 5–7.  Defendants disagree.  In their view, HNB failed to satisfy its obligation under the Lease to provide Defendants with a time and location for the Aircraft's return following the Lease's Expiration Date.  Doc. 35 at 1–2.  In rejoinder, HNB argues that it wasn't required to provide Defendants with a date and location for the Aircraft's redelivery—or to accept delivery at all, for that matter—prior to Defendants' compliance with paragraph (f)(ii) of the Lease's Return Addendum.  Doc 40 at 1–2.

The parties' disagreement over HNB's performance arises from three paragraphs contained in the Lease's Return Addendum:  paragraphs (a), (f), and (m).  As noted above, paragraph (a), titled "Condition Upon Return," provides that Bristow, "upon the expiration, cancellation, or other termination of the Lease," must "return the Aircraft (together with all Records) to [HNB] at a location specified by [HNB] within the continental U.S."  Paragraph (f), titled "Maintenance Contracts," provides that Bristow either must (A) *assign* to HNB its rights and interest in the Engine Maintenance Program in which the Engines were currently enrolled; (B) "*arrange*" to have the Engines "eligible" to be enrolled under a service and maintenance contract between HNB and the Engine's manufacturer, at no cost or expense to HNB and with no initial "buy-in" or "start-up costs," along with some other conditions; or (C) *pay* to HNB an amount equal to the current estimated cost of causing the Engines to be fully enrolled in an Engine Management Program.  And paragraph (m), titled "Holdover Lease" provides that if [Bristow] fails to return the Aircraft (including the Records) at the time, place and in the condition specified in this Return Addendum, . . . all of [Bristow]'s obligations under the Lease shall continue until it is so returned."

HNB argues that those paragraphs, read in tandem, establish that it wasn't obligated to accept redelivery of the Aircraft because paragraph (m) provides that Bristow's obligations under the Lease—including its obligation to possess the Aircraft—continue to run until Bristow complied with its engine maintenance obligations under paragraph (f).  Given Bristow's failure to *assign*, *enroll*, or *pay*, HNB contends that Defendants' obligations under the Lease remain.[4]

---

[4] To be clear, HNB acknowledges that paragraph (a) of the Return Addendum *obligated* it to specify a location within the continental U.S. for return of the Aircraft, but it objects to any interpretation of the Lease that "implies that HNB had any obligation to specify a location for return of the Aircraft *prior* to Bristow [U.S.] complying with the return conditions in the Return Addendum."  Doc. 41 ¶ 60.

Not so, say Defendants. Rather, Defendants point to language in paragraphs (a) and (m) as creating an affirmative obligation (i.e., an express or implied condition precedent) for HNB to designate a time and place for the Aircraft's return before Defendants' obligation to comply with paragraph (f) arises. At minimum, Defendants continue, there is a genuine dispute of material fact concerning whether HNB had such an obligation.

The Court concludes that the Lease is "reasonably or fairly susceptible" to Defendants' interpretation. The Court reaches this conclusion for several reasons. *First*, the principal purpose of the Lease's Return Addendum clearly is to detail obligations concerning the Aircraft's required condition upon its *return*, rather than to detail the Aircraft's required condition upon the Lease's *expiration*. Indeed, obligations arising "upon return," "at the time of return," or "upon redelivery" or "after the return" of the Aircraft appear in almost every paragraph contained in the Addendum. *See, e.g.*, Doc. 1-1, Return Addendum ¶¶ (a) (providing that "[t]he Aircraft, at Lessee's expense, upon redelivery . . . shall be in compliance with all . . . Maintenance Requirements"), (b) (providing that the parties would agree to engage a helicopter appraiser "within ten (10) days after the return of the Aircraft to Lessor" and that, "upon return of the Aircraft," the parties shall consult for the purpose of determining the "Excess Use Amount," if any), (c) (providing that "[u]pon return . . . (iii) all life limited parts and components shall have remaining not less than fifty percent (50%) of the available hours, cycles and/or months, as the case may be, until the next scheduled replacement, other than any such life limited parts and component covered by . . . an Engine Management Program complying with the requirements of paragraph (f)(ii)"), (d)–(e) (setting forth obligations in the event of non-compliance with paragraph (c), which in turns set forth performance obligations due upon the Aircraft's return), (f)(i) (providing that the provisions of paragraphs (c)–(e) will not apply if, "at

the time of return" certain conditions are met), (g) (setting forth obligations in the event of non-compliance with paragraph (c), which in turns set forth performance obligations due upon the Aircraft's return), (f)(ii) (providing that any required payment under this paragraph shall be made on the "Required Return Date") (i) (providing for how much fuel shall be in the tank of the Aircraft "upon return"), (k) (setting forth obligations for performance "concurrently with delivery"). This observation alone militates in favor of Defendants' argument that any obligations they had under paragraph (f)(ii) would ripen only upon the return of the Aircraft, which in turn naturally requires a designated place and time for the Aircraft's return.

*Second*, paragraph (f)—the very provision HNB relies upon—is ambiguous as to when Bristow's duties to assign or to arrange arise. As noted above, paragraph (f), titled "Maintenance Contracts," contains two subparts. Subpart (f)(i), like most other provisions in the Return Addendum, explicitly provides that the maintenance obligations for several of the Aircraft's components are inapplicable "*if at the of the return* of the Aircraft to the Lessor," certain conditions are met. (Emphasis added). Immediately following is subpart (f)(ii), which concerns the Aircraft's Engines. The subpart first provides that "[t]he Engines shall *then* be enrolled in the Engine Maintenance Program," and proceeds to provide Bristow, as Lessee, three options to satisfy its obligation for engine maintenance. Notably absent in that provision, however, is what the word "then" refers to.

Traditionally, the word "then" means refers to something "at that time," "soon after that," or "next in order of time." *Then*, Merriam-Webster, https://www.merriam-webster.com/dictionary/then (last visited Feb. 25, 2019). But subpart(f)(ii) provides no clarity as to what event or condition coincides with (or precedes) the obligation to enroll the Engines in a maintenance program. Of course, the word "then" may refer to the proceeding subpart, (f)(i),

15

which prescribes maintenance obligations for other parts of the Aircraft that arise *at the time of the Aircraft's return* to HNB.  This reading would arguably be the most natural.  HNB's argument to the contrary rests on the assumption that Bristow's obligation arose at or before the Lease's *expiration*, rather than at or after the Aircraft's return.  But neither the language of subpart (f)(ii) nor its surrounding provisions, all concerning obligations upon *return*, support such a reading.

Third, and relatedly, in the few instances in the Return Addendum where the parties have agreed to obligations that precede the physical return of the Aircraft, they expressly state as much.  For example, paragraph (j) provides HNB with the option to instruct Bristow to store the Aircraft for up to thirty days "*upon the expiration*, cancellation or other termination of the Lease."  Similarly, in paragraph (l), Bristow agreed to certify that the Aircraft was in the condition required by the Return Addendum or indicate what maintenance or repair was needed to bring the Aircraft to the specified condition "[n]ot more than forty-five (45) days *prior to the expiration* of the Lease, upon the written request of [HNB]."[5]  However, such language stands in stark contrast to that found in paragraph (f), which contains phrases such as "at the time of the return," *see* Docs. 1-1–1-2, ¶ (f)(i), and "shall then," *id.* ¶ (f)(ii).

Fourth, the paragraphs giving rise to Bristow's obligation to return the Aircraft appear to expressly contemplate that HNB would provide a time and date of return.  *See* Doc. 1-1 ¶¶ (a) (obligating Bristow to return the Aircraft upon the expiration of the contract "at a location *specified by Lessor* within the continental U.S." (emphasis added)), (m) (prescribing holdover rent "[i]f Lessee fails to return the Aircraft (including the Records) *at the time, place* and in the condition specified in this Return Addendum" (emphasis added)).

---

[5] Notably, HNB made no such written request here.  Doc. 41 ¶ 94.

What's more, as Defendants point out, to satisfy paragraph (f)(ii), Defendants retained the option to pay the estimated cost of "causing" the Engines' full enrollment in an Engine Maintenance Program by the "Required Return Date."  Notably, while that term is capitalized, it is left undefined.  However, given that the Return Addendum repeatedly distinguishes between performance obligations due upon the Lease's expiration versus those due upon the Aircraft's physical return, the Court will not *assume* that the Required Return Date is synonymous with the Lease's Expiration Date of January 5, 2017.  *Accord Platek v. Town of Hamburg*, 26 N.E.3d 1167, 1173 (N.Y. 2015) ("The use of different terms in the same agreement . . . implies that they are to be afforded different meanings."); *cf. State St. Bank & Tr. Co. v. Salovaara*, 326 F.3d 130, 139 (2d Cir. 2003) ("It is well-settled that courts should avoid statutory interpretations that render provisions superfluous:  It is our duty to give effect, if possible, to every clause and word of a statute." (internal quotation marks omitted)).  If the Required Return Date is a date distinct from the Lease's Expiration Date, then there is a material question of fact concerning when, if ever, the Required Return Date passed.

*Fifth*, and finally, the definition of the maintenance program in which the Engines were to be enrolled seems to contemplate that Defendants' performance obligation arose *upon return* of the Aircraft.  Specifically, the definition of "Engine Management Program" references paragraph (f)(ii) of the Return Addendum, contains near-identical language to that in paragraph (f)(ii), and suggests that the obligations thereunder is due upon the Aircraft's return:

> Engine Management Program shall mean that certain Maintenance Cost Per Hour ("MCPH") Engine Services Agreement dated as of October 25, 2007
> between . . . GE . . . and Parent . . . or such other similar engine maintenance program from GE or another similar program provider (which such other program shall not be on a pro rate basis, and such other program and the provider thereof must be acceptable to Lessor in its reasonable discretion); and *upon return*, consistent with the requirements of paragraph (f)(ii) of the Return Addendum.

At bottom, while HNB argues that Defendants failed to return the Aircraft in accordance with paragraph (f)(ii) of the Return Addendum, nowhere in its motion papers does it explain *when* Defendants' obligation under that paragraph arose.  Nor is it clear from the Return Addendum that Defendants were required to perform *prior to* redelivery, especially given that they could have satisfied paragraph (f)(ii) by virtue of a payment made at the Aircraft's "Required Return Date."  Nor is it clear that HNB fully performed its obligation under the Lease to designate a time and place for return.  Consequently, at this time the Court cannot conclude as a matter of law that Defendants breached their obligation under the Lease.  Summary judgment in HNB's favor is thus denied.

**B.**   ***There are Questions of Material Fact Concerning Defendants' Performance***

Assuming *arguendo* that HNB fully performed its obligations under the Lease, Defendants argue that there remains a genuine issue of material fact concerning whether they satisfied their obligations under the Lease by complying with Return Addendum paragraph (f)(ii)(B) (i.e., whether they "arrange[d] to have the Engines eligible with no initial 'buy-in' or 'start-up' costs to [HNB] to be completely covered  . . . under a service and maintenance contract between [HNB] and [GE]" at no cost to HNB).  The Court agrees.

HNB argues that Defendants failed to "*make an arrangement* for the Engines to be eligible for enrollment in an engine maintenance program at no cost to HNB and subject to additional specific conditions," in accordance with paragraph (f)(ii)(B).[6]  Doc. 29 at 6.  Specifically, HNB contends that the draft engine maintenance and service agreement it received from GE falls woefully short of the requirements outlined in paragraph (f)(ii)(B) and thus is not

---

[6] The Court, in the previous section, held that there is a genuine dispute of material fact concerning whether and, if so, when the time to pay under paragraph (f)(ii)(C) of the Return Addendum expired.  The Court notes that paragraph (f)(ii)(A) is not at issue here, as Defendants claim they were unable to assign their Engine Maintenance Program benefits to HNB under their contract with GE.  *See* Doc. 23 at 12–13; Doc. 41 ¶ 78.

"in form and substance acceptable to" HNB, as mandated by Return Addendum paragraph (f)(ii)(B).  *See* Doc. 29 at 6–7; Doc. 40 at 2–4.

However, as Defendants correctly note, there is a quintessential issue of material fact as to what the term "*arrange* to the have the Engines *eligible*" means.  For one thing, Defendants argue that a later maintenance and service agreement entered into between HNB and GE in February 2018, six months after Defendants delivered the Aircraft, is substantially similar to that offered to HNB in February 2017 and evidences that the Engines *were* eligible to be covered under a compliant maintenance contract upon the Lease's expiration (assuming the Lease's Expiration Date is the proper reference point).  Doc. 35 at 13–14.  And while HNB argues that both agreements "clearly" do not satisfy paragraph (f)(ii)(B) (and that it entered the 2018 agreement for mitigation purposes only), *see* Doc. 40 at 3, the Court does not find such conclusion "clear."  Thus, denial of summary judgment is proper.

### 2.  Declaratory Relief, Attorneys' Fees, and Defendants' Counterclaims

Given the Court's denial of summary judgment as to HNB's claim for breach of contract, the Court also denies summary judgment to HNB with respect to its claims for declaratory relief and attorneys' fees and with respect to Defendants' counterclaims for breach of contract and breach of the implied covenant of good faith and fair dealing.  As mentioned above, there are myriad questions of fact concerning (1) whether HNB was required to designate a location and time for Bristow to return the Aircraft *prior to* Bristow's obligations under paragraph (f) and (2) whether Bristow did, in fact, *arrange* to have the Engines eligible.[7]  Summary judgment in favor of HNB as to Defendants' counterclaim for unjust enrichment is appropriate, however.

---

[7] Defendants also ask this Court to hold as a matter of law that HNB is not entitled to holdover rent in the event Defendants are found liable for breach of contract.  However, given the denial of summary judgment to HNB, the Court concludes that the question of HNB's entitlement to holdover rent is premature.

"Where the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded.  Only where the contract does not cover the dispute in issue may a plaintiff proceed upon a quasi-contract theory of unjust enrichment." *Ashwood Capital*, 948 N.Y.S.2d at 299 (citations and internal quotation marks omitted).

Here, the Lease clearly covers the dispute at issue.  If Defendants were obligated to satisfy the conditions in paragraph (f)(ii) of the Return Addendum *prior to* HNB's duty to specify a date and location for the Aircraft's return, then Defendants' alleged failure to satisfy those conditions created a continuing obligation for them to possess, store, insure, and otherwise maintain the Aircraft—in addition to continuing rental obligations—and thus Defendants will be unable to recover for costs incurred in fulfilling those obligations.  Alternatively, if HNB had a preceding obligation to assign a date and location for the Aircraft's return, yet refused to do so, Defendants likely would be entitled to recover damages under their counterclaims for breach of contract or breach of the implied covenant of good faith.  In any event, final interpretation of the Lease would define entirely the parties' obligations vis-à-vis each other.  Thus, summary judgment in favor of HNB on Defendants' counterclaim for unjust enrichment is warranted.

**IV. CONCLUSION**

For the reasons explained above, HNB's motion for summary judgment is GRANTED in part and DENIED in part. Specifically, HNB's motion is GRANTED insofar as it seeks dismissal of Defendants' counterclaim for unjust enrichment, and it is DENIED otherwise. The parties are directed to appear for a status conference on <u>Friday, March 15, 2019, at 10:00 A.M.</u>, and to file a joint pretrial statement in accordance with section 3.A of the Court's Individual Practices. The Clerk of Court is respectfully directed to terminate the motion, Doc. 28.

It is SO ORDERED.

Dated:   March 1, 2019
         New York, New York

Edgardo Ramos, U.S.D.J.